# EXHIBIT A

BARON ASSOCIATES P.C.
Bruce Baron, Esq. (BB7297)
2509 Avenue U
Brooklyn, New York 11229
Tel. No.: (718) 934-6501
Fax. No.: (718) 648-7781

SEP 05 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
PATRICIA CONRADT, Individually, and as Administratrix of          07-CV-06623
the Estate of LOUIS WILLIAM CONRADT, JR., deceased,                (DC)(GWG)

                              Plaintiff,                    *PLAINTIFF DEMANDS A*
                                                              *JURY TRIAL*
                        --against--
                                                             VERIFIED
NBC UNIVERSAL, INC.,                                         AMENDED
                              Defendant.                     COMPLAINT
------------------------------------------------------------ X

        As and for a Verified Amended Complaint, PATRICIA CONRADT, Individually, and as

Administratrix of the Estate of LOUIS WILLIAM CONRADT, JR., deceased, by her attorneys,

BARON ASSOCIATES P.C., alleges as follows:

                              JURISDICTION

        1.      This Court has jurisdiction over the subject matter of this action based (a)

on federal question, 28 U.S.C. § 1331, and (b) on diversity of citizenship, 28 U.S.C. § 1332.

        2.      Defendant NBC UNIVERSAL, INC. is incorporated in Delaware, is

registered to do business in New York and conducts substantial business in New York. The

amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

        3.      For plaintiff PATRICIA CONRADT ("PATRICIA") in her individual

capacity, jurisdiction exists based on diversity of citizenship. PATRICIA is a citizen and resident

of the State of Texas.

4.     For plaintiff PATRICIA CONRADT as Administratrix of the Estate of her brother, LOUIS WILLIAM ("BILL") CONRADT, JR., deceased, jurisdiction exists based on diversity of citizenship. PATRICIA was and is appointed Administratrix, by the State of Texas.

5.     Jurisdiction exists based on federal question. Suit is brought to compensate and provide a remedy for injury resulting from violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* The injury is to the estate's property of how BILL is remembered (his "memory"). The defendant has blackened this memory. Suit also is brought for deprivation of life resulting from violations of the federal Civil Rights Act, 42 U.S.C. § 1981 *et seq.*

## VENUE

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(a) and 1391(b). The defendant resides in this judicial district. A substantial part of the events or omissions giving rise to the claims occurred in this judicial district. The defendant (a) is subject to personal jurisdiction in this judicial district and (b) may be found in this judicial district.

## GENERAL ALLEGATIONS

7.     In this Complaint, paragraphs 10 through 63, inclusive, are alleged upon information and belief.

8.     In this Complaint, the defendant is deemed to be vicariously liable for each and every act performed by an employee, associate, agent or representative of the defendant.

9.     At all relevant times, the defendant has acted with fraud, malice and gross negligence. At all relevant times, the conduct of the defendant has been calculated, intentional, wanton and with irresponsible, reckless disregard of the rights of persons in the shoes of BILL or of PATRICIA. Said conduct has been so outrageous as to shock the contemporary conscience.

2

Said conduct of the defendant has been malicious and morally culpable.  Said conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and be atrocious and utterly intolerable in a civilized community.

10.    On information and belief, each and every said act was performed on behalf of the defendant and within the scope of authority, and the knowledge and actions of each and every said employee, associate, agent or representative are fully imputable to the defendant.

11.    On information and belief, said employees, associates, agents and representatives include without limitation (a) each and every employee named herein, (b) each and every city official or officer of a sheriff's or police department named herein and also (c) an organization well-known to the defendant as 'Perverted-Justice'.

<u>THE DEFENDANT</u>

12.    On information and belief, at all relevant times, the defendant has had, and maintains, a principal place of business at 30 Rockefeller Plaza, New York, New York.  The defendant purports to engage in the business of collecting and broadcasting news.

13.    On information and belief, at all relevant times, the defendant has been broadcasting nationwide, on a regular basis, a television show called "Dateline" in the format of a television news-magazine.

14.    On information and belief, in or about the fall of 2004, Dateline initiated a segment presently known as "To Catch a Predator".  In this segment, the defendant presides over a purported sting operation.  The mainstay of the show is public humiliation of individuals lured to a so-called 'sting house' by e-mail correspondence with decoys that have posed as minors.  Sometimes without clothing, the individual soon meets the host, who announces, "I'm Chris Hansen with Dateline NBC."

3

15.    On information and belief, at all relevant times, the defendant has been (a) concerned more with its own profits than with pedophilia and (b) vigilant to find public officials who could be made to betray their oath.  By means of money, services, representations and other things of value, the defendant has sought to compromise said officials into increasing the profits of the defendant at the expense of our children.  Toward that end, the defendant has trolled the nation for governmental officials who cynically would assist it to treat a problem as entertainment.

16.    On information and belief, the manner in which the defendant has come to conduct these sting operations for the Predator series violates many of the defendant's own policies and guidelines, and state and federal laws.  The manner also violates numerous journalistic ethical standards, including but not limited to the following:

(a)    The defendant unethically gives a financial incentive to individuals and/or entities to troll for and lure targets into the sting – with lies and tricks – and thereafter to modify, delete and alter chat logs, with respect to dates, times and content, and other species of evidence.

(b)    The defendant unethically provides local law enforcement with video equipment and video tapes.  The equipment and tapes are used for arrest and prosecution of the guests at the sting house.  By this means, the defendant assures capture on video-tape of its dramatically-staged scenarios.

(c)    The defendant unethically procures law enforcement officials to participate in the Predator stings and to keep the operations secret from higher-ups, by means of illicit money, services, representations and other things of value.

(d)    The defendant unethically obtains otherwise confidential data from local

4

BARUN ASSOCIATES                                        PAGE  09/34

law enforcement officials.

(e)      The defendant's personnel have been deputized as part of the sting operations.

(f)      The defendant unethically covers up the fact that law enforcement officials waive rubber chickens and otherwise act improperly *e.g.* while forcing sting targets to the ground and handcuffing them.

(g)      The defendant procures and otherwise convinces the police to give a special intensity to any arrests, so as to enhance the camera effect – engaging in surplus hollering at suspects, throwing them to the ground and drawing of weapons.

(h)      The defendant procures and otherwise encourages police detectives, whose job it will be to interrogate men caught at the sting houses once they have been brought to the station, to watch Hansen interview them first.

(i)      The defendant's employees, associates, agents and representatives, acting as children, beg individuals to come to the sting locations even after the targets of the sting initially decide not to come.  Transcripts of these conversations are withheld from the public, causing false and defamatory impressions.

(j)      Sting targets are encouraged into non-volitional acts of humiliation, such as accelerated removal of their clothes, in order to sensationalize and enhance the entertainment value of the confrontation and exposure.

(k)      In addition to fabricating evidence, the defendant assists in the preparation of purported search warrants and similar papers that, in fact, are improper in form and/or basis.

At all relevant times, Dateline has not been acting ethically and has failed to take the standard

5

steps needed to insure news reporting accuracy.

17.    On information and belief, at all relevant times, the defendant has been interested more in sensationalizing and dramatizing the various events for profit than in news reporting.

THE STING IN MURPHY

18.    On information and belief, there is a house in Murphy, Texas, that is within two blocks of an elementary school. In or about the fall of 2006, the defendant desired to stage a sting show under the color of the city of Murphy. The defendant requested city manager Craig Sherwood to approve the show. He did so. The defendant, with the help of the city, procured the Murphy house for the purpose of the show and gave to Sherwood a lead investigator. Meanwhile, the Collin County District Attorney demanded that the sting not take place and reminded the city that we are "in the law enforcement business, not show business." As even the mayor later acknowledged, "This was all done for television cameras."

19.    On information and belief, a day or two prior to the beginning of the Murphy sting operation, the defendant installed a high-tech video-projection system in a room at the police headquarters. Along with the projector, the defendant placed all the equipment necessary to stream multiple live video and audio feeds from the sting house. The room was normally a training classroom but now was referred to as the 'war room'.

20.    On information and belief, over four days in November, twenty-four (24) men were arrested at the home. Throughout the sting operation, Murphy police wore very large cameras, on the cutting edge of technology and furnished by the defendant, that normally are worn only by television reporters.

21.    On information and belief, albeit the defendant ran a series of profitable

6

shows, all of the Murphy charges eventually were dropped. The Collin County District Attorney has found that none of the cases was adequate for prosecution. The chat logs, agreed the police, might not be authentic. In all of the Murphy sting-house arrests, there was no prior warrant. The police merely camped outside the house and arrested men if a signal was issued by Dateline. In the hands of the defendant, the police were mere puppets and potted plants, and the arrests were unlawful, as had been predicted by the District Attorney.

22.      On information and belief, initially, children in Murphy had noticed plain-clothed personnel putting up Halloween decorations – even though the holiday had passed. Then the strangers worked on streetlights and ran cable. One Friday, the children started to see a different sort of outsider pull up and go inside, and soon be arrested. Cars sped up and down the street, and police sprinted from hiding spots, guns drawn and cameras ready, to arrest suspects. One of them dropped a bag of crack. Better late than never, parents eventually pulled the curtains and blocked their children from going outside.

23.      On information and belief, the residents of Murphy are resentful and feel used. They hire police officers to serve and protect them – not to expose the citizenry to outside threats in order to stage a show for the profit of the defendant. The residents maintain that city manager Sherwood went against the interest of his employer.

24.      On information and belief, the reason that Sherwood so conducted himself is that the defendant furnished to him money, services, representations and/or other things of value, in a manner and form best known to the defendant and to Sherwood. Under sections 12.33 and 36.02 of the Texas Penal Code, the furnishing is the second-degree felony of bribery punishable by imprisonment for more than one year.

25.      On information and belief, the defendant also furnished to the aforesaid chief

7

of the Murphy police, being Billy Myrick, money, services, representations and/or other things of value, in a manner and form best known to the defendant and to Myrick. Under said sections 12.33 and 36.02, the furnishing is the second-degree felony of bribery punishable by imprisonment for more than one year.

## THE DEATH OF BILL CONRADT

26.    On information and belief, the story of BILL CONRADT begins and ends in the town of Terrell in Kaufman County in the State of Texas. There he was born on January 30, 1950. There he took his life one day after the last scene in Murphy. BILL shot himself at four o'clock in the afternoon, on an overcast Sunday, November 5, 2006. BILL was in his home, the home of his childhood, at 201 Davidson Drive. He lived alone, except for his dog. In an urn on a mantel were the ashes of the previous pet. Terrell is about thirty-five miles away from Murphy – about an hour's drive.

27.    On information and belief, BILL was an assistant prosecutor in neighboring Rockwell County. Prior to that, BILL had been the district attorney of his native Kaufman County five times in a row – quitting the post in 2002 in order to run for district judge. BILL lost this election and was so disheartened that he did not work for about a year. Then, after working as a defense attorney, BILL had taken the position in Rockwell.

28.    On information and belief, at about half an hour past midnight, 12:30 that Sunday morning, the aforesaid Hansen, as host of Predator, had informed the police in Murphy that BILL had contacted a decoy online but never arrived. Hansen asked for a favor, using the words, "If he won't come to us, we'll go to him." He insisted upon the issuance of arrest and search warrants for BILL.

29.    On information and belief, between one and two in the morning, Hansen

8

obtained agreement from the Murphy chief of police, one Billy Myrick. Myrick then assigned the task to a detective, one Walter D. Weiss, known as 'Gator'. Gator had been in and out of interrogation rooms for the past twenty-six hours straight, with no sleep. The chief told Gator he needed the warrants by Sunday noon. The rush for these warrants was not explicable in terms of normal practice. The chief was trying merely to accommodate the schedule of the defendant.

30.     On information and belief, at a little before eleven o'clock in the morning, Gator finished the arrest warrant. A local municipal judge, one Cathy Haden, had come to headquarters and signed it.

31.     On information and belief, Gator then began a *search* warrant. He took it to a judge. Gator did not inform the judge that Predator would be present. Although the judge signed the warrant, he would not have signed had he been informed that Predator would be present. No reasonable judge would have signed the warrant had he been so informed.

32.     On information and belief, the so-called search warrant was 'spun off' from a search warrant that addressed a search in a different county and month. Gator never modified these and other discrepancies. No one ever tailored the so-called warrant to the events now unfolding. At the behest of the defendant, communicated through Myrick, no mention of Dateline's involvement ever was made to the issuing judge. The judge himself has said so and, indeed, that suicide was foreseeable. The defendant blocked this judicial officer from ever making a disinterested determination of the necessity, location, scope and conditions of any incursion. In truth and in fact, no search warrant at all was necessary to the effective investigation of any crime.

33.     On information and belief, early that afternoon, lieutenant Adana Barber from the Murphy police department called the chief of the Terrell police department and asked

for his assistance in making the arrest. The Terrell chief agreed.

34.    On information and belief, early that Sunday, Hansen was in Terrell. By three o'clock, he was outside BILL's house.

35.    On information and belief, at about four o'clock, a Terrell sergeant knocked on the front door to BILL's yard. The sergeant was accompanied by a Terrell patrol officer and a Murphy detective, whose gun was drawn. Meanwhile, the Murphy police chief and the aforesaid Barber were about thirty feet away, hiding behind trees.

36.    On information and belief, at the same time, various cameramen of the defendant had trespassed onto BILL's property. The defendant's cast and crew numbered approximately *ten*. Also in attendance was at least one representative of the aforesaid Perverted-Justice.

37.    On information and belief, the Terrell police soon called upon the Terrell SWAT team – not because ordinary procedure called for such a measure, but merely because the police believed that this suited the thirst for sensationalism of the defendant.

38.    On information and belief, receiving no answer at the front door, the police entered the yard. Soon all of the members of the SWAT team had arrived. The party then forced open a locked glass sliding door at the rear of the house and entered.

39.    On information and belief, the door led into a room where BILL was accustomed to work on his computer. Two feet away from the computer lay a workbook from a district-attorneys conference that BILL had attended back in June. The title was "Investigation and Prosecution of Child Sexual Abuse".

40.    On information and belief, once inside, the police called out, "Terrell Police!" Next, they called out the word 'Warrant' – prefixed with an adjective. The adjective

10

was 'Search' – not 'Arrest'. The police called out 'Warrant' only once – not twice. They prefixed it with only one adjective – not two. The police called out 'Search Warrant' – not 'Arrest Warrant'.

41.    On information and belief, once the police were inside, they stepped through a doorway that was adjacent to a collection of Abraham Lincoln artifacts – wood from his house and office and cloth from his coffin. At the end of a hallway, stood BILL. He stepped back into a room and said, "I'm not gonna hurt anyone." Whereupon BILL picked up his handgun and shot himself.

42.    On information and belief, thereupon a police officer said to a Dateline producer, "That'll make good TV." As for Hansen, the immediate reaction was to wonder *how much to report.* How much would be good or bad for his employer? He turned to Lieutenant Barber and insisted upon her advice. She gave it. Then a 'Care Flight' ambulance helicopter arrived and took BILL to the emergency room at Parkland Hospital in Dallas. Death was within an hour.

43.    On information and belief, once BILL was dead, the defendant was first to the news wires. For the defendant, to hawk news of his death was to brag about the fruit of its own poisonous tree. The murderer was first to the news wires but must be last in court. Having caused BILL's death, the defendant is uniquely not able to call the event a matter of legitimate public interest or of public concern. Whatever might be the right of a competitor new and neutral, for the defendant there exists no right to peddle the artifacts of this tragedy. Even where the defendant's last acts of obtaining information might otherwise be lawful, they are polluted by initial acts that were not. When performed by the defendant, any and all dissemination is disrobed of immunity. What an innocent competitor might seek to disclose – the culpable

11

BARON ASSOCIATES                    PAGE  16/34

defendant must keep secret.

44.　　On information and belief, the defendant has possessed and does possess photos of the body, the gun and the death scene, audio tapes of BILL's last words and video tapes of the house and other aspects of the property. The defendant has published, and is likely to publish, various gruesome details of BILL's death. The defendant has released, and is likely to release, such materials – often cleverly edited so as further to crush the truth and trample on whatever remains of the memory of BILL and the feelings of PATRICIA.

## THE MEMORY OF BILL CONRADT

45.　　On information and belief, with the death of Bill Conradt, the area lost his many good qualities. BILL was a nice, quiet, soft-spoken, hard-working, methodical, thorough and intelligent individual. It was characteristic of him to part from a friend with the words, "Is there anything I can do for you?" BILL was highly respected, courteous and easy to work alongside.

46.　　On information and belief, BILL was the 1968 salutatorian of Terrell High School, voted 'most likely to succeed'. In 1975, he was admitted to practice law. BILL served both as a prosecutor and in private practice and also as a former Terrell municipal court judge and a special county court judge for Kaufman County.

47.　　On information and belief, from the earliest days, BILL had chosen a good name rather than great riches: it was the jewel of his soul. The stigma of suicide irrevocably has spread its dark shadow over this good name – so as to blacken what otherwise would have been valuable property of his estate: how BILL is remembered – his 'memory'.

## PATRICIA CONRADT

48.　　On information and belief, next of kin is BILL's sister, plaintiff PATRICIA

12

CONRADT.

49.     On information and belief, a wrong against BILL has been in many ways a wrong against PATRICIA.  The aforesaid home of BILL's childhood and scene of his demise was also the home of PATRICIA's childhood.  PATRICIA too had an expectation of privacy therein.  By causing BILL's death as aforesaid, the defendant did cause the public broadcasting of depictions of this home and has otherwise engaged in narrating, explaining, filming and broadcasting that has trapped PATRICIA in a climate of public ridicule, embarrassment, humiliation and fear.  As a result of the defendant's manipulation of the police, PATRICIA has lost control over the 'face' that she puts on and consequently over her self-identity.  She has suffered humiliation beneath the gaze of those whose curiosity takes its cue from the defendant.  Though the defendant has been a master voyeur, acting from avarice, and the public has been merely a reflex voyeur – in either case, PATRICIA has become a mere object.

50.     On information and belief, on or about December 5, 2006, Patricia was qualified to be Independent Administrator of the estate and duly received Letters of Independent Administration in Kaufman County.  (The Letters with Certificate of Death are attached as Exhibit A.)  The appointment continues to be in full force and effect.

### THE PATTERN OF BRIBERY

51.     On information and belief, at all relevant times, the defendant has been engaged in a persistent course of public humiliation of visitors to certain online chat rooms and engaged in a pattern of bribery of public officials that targets such visitors.

### The Sting in Riverside County, California

52.     On information and belief, in or about February 2006, the defendant desired to stage a sting show under the color of the sheriff's department in Riverside County, California.

13

The defendant approached Lieutenant Chad Bianco. Immediately he perceived that the spectacle would be harmful to his community. Wisely, the supervisors never had allocated to the Department the resources that the circus would require. Said Bianco, in words or in substance:

> We wouldn't know what we'd get. Would we have a foot pursuit? Would they be armed? They might come from all over. Riverside bleeding to solve a non-Riverside problem. Just because you want to make money....

Moreover, there existed a local Internet task force controlled by sworn, trained and experienced and scrupulous law enforcement personnel, rather than by money-making New York civilians. The defendant replied, in words or in substance, as follows:

> Yes, but they have caught just four people in a year. Think what this will do for your career. The supervisors don't understand that you need to move forward rather than do things the way you've always done them. Help your career. Be progressive.

When Bianco remarked that helping the defendant make money would surely mean a deluge of phone calls in the middle of the night that would disrupt his own personal life, the defendant responded, in words or in substance, "Don't worry. We'll help you get away. We'll make it easier...." The defendant kept this promise by furnishing money, services, representations and/or other things of value. Under sections 17 *et seq.* and 67.5 of the California Penal Code, the furnishing constituted felony bribery punishable by imprisonment for more than one year.

### The Sting in Greenville, Ohio

53.     On information and belief, in or about March 2006, the defendant desired to stage a sting show under the color of the sheriff's department of Darke County, Ohio. The defendant located a house at 6710 5K Avenue in Greenville and paid one Richard Barton over five thousand dollars ($5,000) for its use. The defendant also desired members of the department to give a green light to the show, to deputize the defendant's personnel, to keep the operation secret from higher authorities and otherwise to assist in the planned entertainment. For this

14

purpose, the defendant furnished money, services, representations and/or other things of value to detective Mike Burns, chief deputy William Grice and/or others in the department, in a manner and form best known to the defendant and to the recipient. Under sections 2921.02 and 2929.14(A)(3) of the Ohio Revised Code, the furnishing constituted the third-degree felony of bribery punishable by imprisonment for more than one year.

### The Sting in Fort Myers, Florida

54.     On information and belief, in or about April 2006, the defendant desired to stage a sting show under the color of the police department in Fort Myers, Florida. For this purpose, the defendant furnished money, services, representations and/or other things of value to Chief Hilton Daniels, in a manner and form best known to the defendant and to Daniels. As with all of the sting shows herein described, the defendant both knew of the official capacity of Daniels and intended to influence his action. Under sections 775.082 *et seq.* and 838.015 *et seq.* of the Florida Statutes, the furnishing constituted the second-degree felony of bribery punishable by imprisonment for more than one year.

### The Sting in Petaluma, California

55.     On information and belief, in or about February 2006, the defendant desired to stage a sting show under the color of the police department in Petaluma, California. The defendant approached Lieutenant Daniel Fish. Realizing that the show would more attract undesirables than repel them, and that the town had never authorized such an adventure, Fish initially said, "No." He understood that the spectacle and danger posed by the show would more be *bad* for his employer than *good.* "But don't be reactive," counseled the defendant, in words or in substance. "Yes, take them off the streets of other places." Fish continued in words or in substance that Petaluma and its real estate values already had suffered notoriety because of the

15

murder of one Polly Klaas. "Now we will be known as the gateway to San Quentin. What's in it for us? Nothing. Though what's in it for you New Yorkers? Plenty." The defendant countered with a promise to put something 'in it' for Fish. There ensued money, services, representations and/or other things of value, in a manner and form best known to the defendant and to Fish. This amounted, under sections 17 *et seq.* and 67.5 *supra* of the California Penal Code, to felony bribery punishable by imprisonment for more than one year.

56.     On information and belief, the defendant also furnished to Sergeant Matthew Stapleton of the Petaluma Police Department money, services, representations and/or other things of value, in a manner and form best known to the defendant and to Stapleton. Under said sections 17 *et seq.* and 67.5, the furnishing is felony bribery punishable by imprisonment for more than one year.

### The Sting in Long Beach, California

57.     On information and belief, in or about September 2006, the defendant desired to stage a sting show under the color of the police department in Long Beach, California. The defendant approached sergeant Lee DeBrabander. Among other objections, DeBrabander protested that his merely planning for the defendant's moneymaker was a huge headache. The police would need to have surveillance all over the area in undercover vehicles. They would have to put a full-fledged arrest team in place: probably, in excess of twenty-five (25) officers at any given time.

58.     On information and belief, DeBrabander added, in words or in substance, that most of the lurees would probably hail from outside Long Beach, and thus be not its problem. For whatever Long Beach residents, their spectacular arrest would have a ruinous effect on innocent family numbers. *One* pathetic individual would be arrested under klieg lights

16

that were more to the purpose of *profit* than *cure*. *Many* innocent tax-paying family members would share his humiliation. "Don't worry, we'll make it worth your while personally," said the defendant in words or in substance. There ensued money, services, representations and/or other things of value, in a manner and form best known to the defendant and to DeBrabander. Under sections 17 *et seq.* and 67.5 *supra* of the California Penal Code, this constituted felony bribery punishable by imprisonment for more than one year.

### The Sting in Flagler Beach, Florida

59.     On information and belief, in or about November 2006, as the blood of BILI still dribbled in Terrell, the defendant desired to stage a sting show under the color of the police department in Flagler Beach, Florida. The defendant was engaged in discussions with Police Chief Roger Free. They spoke about a sting to take place the next month. "Am I an idiot, after what happened in Texas?" he replied in words or in substance. "What's more: it will be the day of the Christmas parade; there will be lots of kids in town. Parents will be upset. The commissioners do not want the town to be *used*. We do not need this exposure." The defendant countered, in words or in substance, "That is the slot that we have available. Don't tell the commissioners until afterwards. They won't want to seem pro-pervert!" Thereupon the defendant opened its bag of money, services, representations and/or other things of value and made the trouble of the police chief worthwhile. Under sections 775.082 *et seq.* and 838.015 *et seq. supra* of the Florida Statutes, the defendant engaged in the second-degree felony of bribery punishable by imprisonment for more than one year.

### THE DEFENDANT AS AN ENTERPRISE

60.     On information and belief, at all relevant times, Dateline numbered among its personnel (a) the aforesaid host Chris Hansen, (b) producer Lynn Keller, (c) senior producer

17

Allan Maraynes, (d) executive producer David Corvo and (e) attorney Craig Bloom. In or about the winter of 2005-2006, at a time best known to them, these persons came to share a common purpose. This purpose was to loosen the inhibitions of, and oaths taken by, law enforcement and other governmental officials with regard to Predator sting shows by means of bribery. At that time, Hansen, Keller, Maraynes, Corvo and Bloom agreed amongst themselves and with their superiors at the defendant that the Dateline group would work to achieve this purpose. At all relevant times, the defendant well knew of, endorsed and funded both this agreement and the activities committed in furtherance thereof. In this manner, the 'Catch a Predator' finger of the 'Dateline' hand of the television-production arm of the defendant became an enterprise affecting interstate commerce, within the meaning of 18 U.S.C. § 1961(4).

61.     On information and belief, at all relevant times, the staff of Dateline has had a common communication network for sharing information on a regular basis. At times and places well known to them, Hansen, Keller, Maraynes, Corvo and Bloom have held meetings and sessions where important discussions took place, and have engaged in common training and instruction. They have done so with the full knowledge, acquiescence and encouragement of the defendant, for its benefit and on its behalf. The officers and directors of the defendant had knowledge of, and were recklessly indifferent toward, the unlawful activity.

## PROXIMATE CAUSATION

62.     On information and belief, at the time of BILL's death, as its employees, associates, agents and representatives swarmed upon his yard, the defendant was engaged in restraining BILL's ability to fend for himself. The defendant had imposed upon BILL harsh limitations to act on his own behalf. By means *inter alia* of its employees, associates, agents and representatives who were trespassers and invaders upon his property, the defendant effectively

18

had placed BILL in its custody. The defendant was subjecting BILL to a special relationship akin to the relationship that a prison has with an inmate. This special relationship engendered a duty to protect him *inter alia* from suicide. The suicide was reasonably foreseeable. It was foreseeable that BILL's emotional state might be frail in general, and that he might have a tendency to suicide in particular.

63.     On information and belief, with regard to said duty to protect BILL, the defendant was deliberately indifferent. At this time, the defendant wore the robe of a state official, and BILL wore the shackles of a detainee. Having trespassed and invaded upon BILL's property to broadcast a spectacle to millions, the defendant took no more steps towards protecting him than are received by a gladiator or bull.

64.     Under the Fourth Amendment to the Constitution of the United States of America, a person has the inviolable right to be secure against an unreasonable search or seizure, and same is unreasonable unless pursuant to a warrant issued upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and what is to be seized.

65.     Under the Fourteenth Amendment to the Constitution of the United States of America, neither the State of Texas nor an actor under color thereof is permitted to deprive a person of life, liberty or property, without due process of law.

66.     Under 42 U.S.C. § 1983, every person who, under color of the State of Texas, causes a person to be subjected to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, is liable to the party injured for redress.

19

PATRICIA CONRADT,
AS ADMINISTRATRIX OF
THE ESTATE OF
LOUIS WILLIAM CONRADT, JR.

FIRST CAUSE OF ACTION:
INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS
(PURSUANT TO THE LAWS OF TEXAS)

67.     As Administratrix of the Estate of Louis William Conradt, Jr., plaintiff

PATRICIA CONRADT does repeat and re-allege each and every allegation set forth in

paragraphs numbered 1 through 66 inclusive.

68.     As a proximate result of the aforesaid conduct of the defendant, BILL

suffered severe emotional distress, mental anguish and wrongful penetration of mental tranquility

and otherwise was injured in his health and person.

69.     Under the laws of Texas, the estate is entitled to recover from the defendant

the actual damages, estimated to be in an amount not less than thirty-five million dollars

($35,000,000.00), in addition to costs of suit and reasonable attorney fees.

PATRICIA CONRADT,
AS ADMINISTRATRIX OF
THE ESTATE OF
LOUIS WILLIAM CONRADT, JR.

SECOND CAUSE OF ACTION:
NEGLIGENCE
(PURSUANT TO THE LAWS OF TEXAS)

70.     As Administratrix of the Estate of Louis William Conradt, Jr., plaintiff

PATRICIA CONRADT does repeat and re-allege each and every allegation set forth in

paragraphs numbered 1 through 66 inclusive.

71.     At all relevant times, the defendant, and in particular the 'Dateline'

20

enterprise thereof, and in particular the 'Catch a Predator' enterprise of Dateline, owed to BILL a legal duty. The duty was twofold: (a) not to push law enforcement agencies to do what they otherwise would not do and (b) to protect against such risks as *suicide* in case the defendant would push.

72.    By means *inter alia* of badgering the Murphy police after midnight, the defendant did push law enforcement agencies to do what they otherwise would not do. By means *inter alia* of concealing Dateline's involvement from the judge who issued the so-called search warrant, the defendant did fail to protect against such risks as *suicide*. On both prongs, the defendant breached its duty.

73.    As a proximate result of said conduct of the defendant, BILL suffered severe emotional distress, mental anguish and wrongful penetration of mental tranquility and otherwise was injured in his health and person.

74.    Under the laws of Texas, the estate is entitled to recover from the defendant the actual damages, estimated to be in an amount not less than thirty-five million dollars ($35,000,000.00), in addition to costs of suit and reasonable attorney fees.

PATRICIA CONRADT,<br>
AS ADMINISTRATRIX OF<br>
THE ESTATE OF<br>
LOUIS WILLIAM CONRADT, JR.

THIRD CAUSE OF ACTION:<br>
PURSUANT TO 42 U.S.C. § 1983<br>
(CIVIL RIGHTS ACT)

75.    As Administratrix of the Estate of Louis William Conradt, Jr., plaintiff PATRICIA CONRADT does repeat and re-allege each and every allegation set forth in paragraphs numbered 1 through 66 inclusive.

21

76. As a result of the defendant's aforesaid activity, BILL was deprived of his life, liberty and property under color of the State of Texas without due process of law. Pursuant to 42 U.S.C. § 1983, his estate is entitled to recover from the defendant the actual damages, estimated to be in an amount not less than thirty-five million dollars ($35,000,000.00), in addition to costs of suit and reasonable attorney fees.

PATRICIA CONRADT,
AS ADMINISTRATRIX OF
THE ESTATE OF
LOUIS WILLIAM CONRADT, JR.

FOURTH CAUSE OF ACTION:
PURSUANT TO 18 U.S.C. § 1964(c)
(RICO)

77. As Administratrix of the Estate of Louis William Conradt, Jr., plaintiff PATRICIA CONRADT does repeat and re-allege each and every allegation set forth in paragraphs numbered 1 through 66 inclusive.

78. Under 18 U.S.C. § 1961(1)(A), an act or threat involving bribery which is chargeable under State law and punishable by imprisonment for more than one year is an act of racketeering activity.

79. At all relevant times, the defendant, and in particular the 'Dateline' enterprise thereof, and in particular the 'Catch a Predator' enterprise of Dateline, was engaged in interstate commerce. The activities of the defendant, and in particular of the 'Catch a Predator' enterprise, did affect such commerce.

80. As aforesaid, the employees, associates, agents and representatives of the defendant did conduct, and participate in the conduct of, the affairs of the 'Catch a Predator' enterprise through a pattern of racketeering activity.

22

81.    The aforesaid acts of bribery amount to a pattern of racketeering activity under 18 U.S.C. § 1961(5), and a violation of 18 U.S.C. § 1962(c), which prohibits participation in the conduct of the affairs of an enterprise through such a pattern, for which the defendant is responsible. This bribery was accompanied by a pattern of mail and wire fraud, as defined 18 U.S.C. §§ 1341 and 1343.

82.    As a result of this pattern of racketeering activity, BILL was injured in his property, including without limitation his *memory*. Under the law of Texas, which here applies. BILL's estate possesses an item of property called his *memory*: how BILL is remembered. As a result of the RICO pattern, this memory was blackened. Pursuant to 18 U.S.C. § 1964(c), BILL's estate is entitled to recover from the defendant treble the actual damages, estimated to be in an amount not less than thirty-five million dollars ($35,000,000.00), in addition to costs of suit and reasonable attorney fees.

### PATRICIA CONRADT, INDIVIDUALLY

### FIFTH CAUSE OF ACTION: INTENTIONAL INTRUSION UPON THE RIGHT TO BE LEFT ALONE (PURSUANT TO THE LAWS OF TEXAS)

83.    In her individual capacity, plaintiff PATRICIA CONRADT does repeat and re-allege each and every allegation set forth in paragraphs numbered 1 through 66 inclusive.

84.    In conducting itself as aforesaid, the defendant intentionally has intruded, physically and otherwise, upon PATRICIA's seclusion, solitude and right to be left alone, to an extent that would be considered highly offensive by a reasonable person.

85.    As a result, PATRICIA has suffered severe emotional distress, mental anguish and wrongful penetration of mental tranquility and otherwise has been injured in her

23

09/05/2007   14:58   7180401101

health and person.

86.     Under the laws of Texas, PATRICIA is entitled to recover from the defendant the actual damages, estimated to be in an amount not less than five million dollars ($5,000,000.00), and punitive damages in an amount not less than thirty million dollars ($30,000,000.00), in addition to costs of suit and reasonable attorney fees.

PATRICIA CONRADT,
INDIVIDUALLY

SIXTH CAUSE OF ACTION:
INTENTIONAL DISCLOSURE OF
PRIVATE FACTS
(PURSUANT TO THE LAWS OF TEXAS)

87.     In her individual capacity, plaintiff PATRICIA CONRADT does repeat and re-allege each and every allegation set forth in paragraphs numbered 1 through 66 inclusive.

88.     In conducting itself as aforesaid, the defendant intentionally has engaged in disclosure of facts that are private to PATRICIA, to an extent that would be considered highly offensive by a reasonable person.

89.     As a result, PATRICIA has suffered severe emotional distress, mental anguish and wrongful penetration of mental tranquility and otherwise has been injured in her health and person.

90.     Under the laws of Texas, PATRICIA is entitled to recover from the defendant the actual damages, estimated to be in an amount not less than five million dollars ($5,000,000.00), and punitive damages in an amount not less than thirty million dollars ($30,000,000.00), in addition to costs of suit and reasonable attorney fees.

24

PATRICIA CONRADT,
INDIVIDUALLY
——

SEVENTH CAUSE OF ACTION:
INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS
(PURSUANT TO THE LAWS OF TEXAS)

91.     In her individual capacity, plaintiff PATRICIA CONRADT does repeat and re-allege each and every allegation set forth in paragraphs numbered 1 through 66 inclusive.

92.     As a proximate result of the aforesaid conduct of the defendant, PATRICIA has suffered severe emotional distress, mental anguish and wrongful penetration of mental tranquility and otherwise has been injured in her health and person.

93.     Under the laws of Texas, PATRICIA is entitled to recover from the defendant the actual damages, estimated to be in an amount not less than five million dollars ($5,000,000.00), and punitive damages in an amount not less than thirty million dollars ($30,000,000.00), in addition to costs of suit and reasonable attorney fees.

PATRICIA CONRADT,
INDIVIDUALLY
——

EIGHTH CAUSE OF ACTION:
NEGLIGENCE
(PURSUANT TO THE LAWS OF TEXAS)

94.     In her individual capacity, plaintiff PATRICIA CONRADT does repeat and re-allege each and every allegation set forth in paragraphs numbered 1 through 66 inclusive.

95.     At all relevant times, the defendant, and in particular the 'Dateline' enterprise thereof, and in particular the 'Catch a Predator' enterprise of Dateline, owed to PATRICIA a legal duty not to push law enforcement agencies to do what they otherwise would not do.

25

96.    By means *inter alia* of badgering the Murphy police after midnight, the defendant did push law enforcement agencies to do what they otherwise would not do, in breach of the defendant's said duty, thereby unfastening a Pandora's box of adverse consequences.

97.    As a proximate result of said conduct of the defendant, PATRICIA has suffered severe emotional distress, mental anguish and wrongful penetration of mental tranquility and otherwise has been injured in her health and person.

98.    Under the laws of Texas, PATRICIA is entitled to recover from the defendant the actual damages, estimated to be in an amount not less than five million dollars ($5,000,000.00), and punitive damages in an amount not less than thirty million dollars ($30,000,000.00), in addition to costs of suit and reasonable attorney fees.

PATRICIA CONRADT,
AS ADMINISTRATRIX OF
THE ESTATE OF
LOUIS WILLIAM CONRADT, JR.
—

NINTH CAUSE OF ACTION:
UNJUST ENRICHMENT
(PURSUANT TO THE LAWS OF TEXAS)

99.    As Administratrix of the Estate of Louis William Conradt, Jr., plaintiff PATRICIA CONRADT does repeat and re-allege each and every allegation set forth in paragraphs numbered 1 through 66 inclusive.

100.    As a proximate result of the aforesaid conduct of the defendant, and in the course thereof, the defendant was enriched at BILL's expense.  Equity and good conscience militate against permitting the defendant to retain said enrichment.

101.    Under the laws of Texas, the estate is entitled to recover from the defendant the actual enrichment, estimated to be in an amount not less than thirty-five million dollars

($35,000,000.00), in addition to costs of suit and reasonable attorney fees.

PRAYER FOR RELIEF

WHEREFORE, plaintiff PATRICIA CONRADT respectfully demands judgment as follows:

1.    As Administratrix of the Estate of LOUIS WILLIAM CONRADT, JR., deceased, on the first cause of action, pursuant to the laws of Texas, for intentional infliction of emotional distress, the sum of the actual damages, estimated to be in an amount not less than thirty-five million dollars ($35,000,000.00), interest before and after judgment at the highest lawful rate and reasonable attorneys' fees, together with injunctive relief.

2.    As Administratrix of the Estate of LOUIS WILLIAM CONRADT, JR., deceased, on the second cause of action, pursuant to the laws of Texas, for negligence, the sum of the actual damages, estimated to be in an amount not less than thirty-five million dollars ($35,000,000.00), interest before and after judgment at the highest lawful rate and reasonable attorneys' fees, together with injunctive relief.

3.    As Administratrix of the Estate of LOUIS WILLIAM CONRADT, JR., deceased, on the third cause of action, pursuant to 42 U.S.C. § 1983, the sum of the actual damages, estimated to be in an amount not less than thirty-five million dollars ($35,000,000.00), interest before and after judgment at the highest lawful rate and reasonable attorneys' fees, together with injunctive relief.

4.    As Administratrix of the Estate of LOUIS WILLIAM CONRADT, JR., deceased, on the fourth cause of action, pursuant to 18 U.S.C. § 1964(c), the sum of the actual damages, estimated to be in an amount not less than thirty-five million dollars ($35,000,000.00), statutory treble damages under 18 U.S.C. § 1964(c), interest before and after judgment at the

27

highest lawful rate and reasonable attorneys' fees, together with injunctive relief.

5.    In her individual capacity, on the fifth cause of action, pursuant to the laws of Texas, for intentional intrusion upon the right to be left alone, the sum of the actual damages, estimated to be in an amount not less than five million dollars ($5,000,000.00), and punitive damages in an amount not less than thirty million dollars ($30,000,000.00), interest before and after judgment at the highest lawful rate and reasonable attorneys' fees, together with injunctive relief.

6.    In her individual capacity, on the sixth cause of action, pursuant to the laws of Texas, for intentional disclosure of private facts, the sum of the actual damages, estimated to be in an amount not less than five million dollars ($5,000,000.00), and punitive damages in an amount not less than thirty million dollars ($30,000,000.00), interest before and after judgment at the highest lawful rate and reasonable attorneys' fees, together with injunctive relief.

7.    In her individual capacity, on the seventh cause of action, pursuant to the laws of Texas, for intentional infliction of emotional distress, the sum of the actual damages, estimated to be in an amount not less than five million dollars ($5,000,000.00), and punitive damages in an amount not less than thirty million dollars ($30,000,000.00), interest before and after judgment at the highest lawful rate and reasonable attorneys' fees, together with injunctive relief.

8.    In her individual capacity, on the eighth cause of action, pursuant to the laws of Texas, for negligence, the sum of the actual damages, estimated to be in an amount not less than five million dollars ($5,000,000.00), and punitive damages in an amount not less than thirty million dollars ($30,000,000.00), interest before and after judgment at the highest lawful rate and reasonable attorneys' fees, together with injunctive relief.

9.    As Administratrix of the Estate of LOUIS WILLIAM CONRADT, JR.,

28

deceased, on the ninth cause of action, pursuant to the laws of Texas, for unjust enrichment, the sum of said enrichment, estimated to be in an amount not less than thirty-five million dollars ($35,000,000.00), interest before and after judgment at the highest lawful rate and reasonable attorneys' fees, together with injunctive relief.

10.    Granting court costs and such other and further relief as this Court deems just and proper.

Dated:    Brooklyn, New York
          September 4, 2007

Yours



BARON & ASSOCIATES P.C.

By: Bruce Baron, Esq (BB7297)
Attorneys for the Plaintiff
2509 Avenue U
Brooklyn, New York 11229
(718) 934-6501

29