UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x
                                    :
PATRICIA CONRADT, as
Administratrix of the Estate of     :
LOUIS WILLIAM CONRADT, JR.,
Deceased,                           :

                  Plaintiff,        :          **OPINION**

          - against -               :          07 Civ. 6623 (DC)

NBC UNIVERSAL, INC.,                :

                  Defendant.        :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**            BARON ASSOCIATES P.C.
                                By:  Bruce Baron, Esq.
                            2509 Avenue U
                            Brooklyn, New York  11229
                              Attorneys for Plaintiff

                            LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
                                By:  Lee Levine, Esq.
                                     Amanda M. Leith, Esq.
                            321 West 44th Street, Suite 510
                            New York, New York  10036
                                     - and -
                            HILARY LANE, Esq.
                            SUSAN WEINER, Esq.
                            NBC Universal, Inc.
                            30 Rockefeller Plaza
                            New York, New York  10112
                              Attorneys for Defendant

**CHIN, District Judge**

        On November 5, 2006, Louis William Conradt, Jr.

("Conradt") -- an assistant district attorney in Texas -- shot

himself in his home as he was about to be arrested by the police

for attempting to solicit a minor online.  Waiting outside the

house were members of the cast and crew of the national televison

news show Dateline NBC ("Dateline").  They were there to film

Conradt's arrest for a segment of "To Catch A Predator" -- a show

that works with local police departments and an on-line
"watchdog" group called Perverted Justice to identify and arrest
"sexual predators."  Apparently unable to face the humiliation of
the public spectacle that faced him, Conradt took his own life.

In this case, Conradt's sister, Patricia Conradt, sues
defendant NBC Universal Inc. ("NBC"), alleging that Dateline is
responsible for her brother's death and the harm to his
reputation and "good name."  On behalf of herself and his estate
(the "Estate"), she seeks in excess of $100 million in
compensatory and punitive damages.

NBC moves, pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure, to dismiss the amended complaint for
failure to state a claim upon which relief may be granted.  NBC
argues, among other things, that it owed Conradt no duty to
protect him from suicide and that neither it nor the police
violated Conradt's rights under the Fourth Amendment to be free
from unreasonable searches and seizures.  It alleges further that
its alleged conduct was not "extreme and outrageous" in the sense
required under Texas law for a claim of intentional infliction of
emotional distress.

Although many of plaintiff's claims will be dismissed,
the principal claims survive, for if the allegations of the
amended complaint are proven, a reasonable jury could find that
NBC crossed the line from responsible journalism to irresponsible
and reckless intrusion into law enforcement.  Rather than merely
report on law enforcement's efforts to combat crime, NBC

purportedly instigated and then placed itself squarely in the
middle of a police operation, pushing the police to engage in
tactics that were unnecessary and unwise, solely to generate more
dramatic footage for a television show.  On the facts alleged in
the amended complaint, for example, a reasonable jury could find
that there was no legitimate law enforcement need for a heavily
armed SWAT team to extract a 56-year old prosecutor from his home
when he was not accused of any actual violence and was not
believed to have a gun, and that this was done solely "to
sensationalize and enhance the entertainment value" of the
arrest.  A reasonable jury could find that by doing so, NBC
created a substantial risk of suicide or other harm, and that it
engaged in conduct so outrageous and extreme that no civilized
society should tolerate it.

       For the reasons set forth more fully below, NBC's
motion is granted in part and denied in part.

                    **STATEMENT OF THE CASE**

**A.    The Facts**

       The following facts are drawn principally from the
amended complaint and are assumed to be true for purposes of this
motion.  Certain facts are drawn from the episode of "To Catch A
Predator" that aired on Dateline on February 20, 2007.[1]

_____

       [1]  Following oral argument of this motion, the Court asked
NBC to submit a copy of the February 20, 2007 episode.  NBC
submitted two DVDs:  one of the entire episode and one with just
the segment on Conradt.  The Court has viewed the DVD of the
entire episode (the "DVD") and deemed it incorporated by
reference into the amended complaint.

                              -3-

1. **The Parties**

Plaintiff, a citizen of Texas, is the administratrix of the Estate.  (Compl. ¶¶ 3, 4).  She grew up in the house where Conradt committed suicide.  (Id. ¶ 49).

NBC is incorporated in Delaware and has its principal place of business in New York.  (Id. ¶¶ 2, 12).  NBC broadcasts a nationwide television "news-magazine," Dateline.  (Id. ¶ 13).

2. **To Catch A Predator**

In 2004, Dateline began producing and broadcasting a series of segments entitled "To Catch A Predator."  (Id. ¶ 14). NBC characterizes the series as "an investigative news series" and refers to Dateline as a "news program."  (Def. Mem. at 1). Working with Perverted Justice and local police departments, Dateline uses "decoys" posing as teenagers on-line to "lure," with the promise of sex, individuals suspected of being sexual predators to a "'sting house.'"  (Compl. ¶¶ 11, 14, 16(a)). There, the decoy -- who is an adult actor posing as a young teenager supposedly alone at home -- invites the individual into the house.  (DVD).  After a few moments, the decoy leaves and the host of the show, NBC correspondent Chris Hansen, appears. Hansen confronts the individual and starts asking questions, such as "why are you here?"  (Id.).  In some instances, the individual immediately tries to run out of the house.  Surprisingly, however, in many instances the individual answers Hansen's questions and allows himself to be interviewed by Hansen, who is armed with a transcript of the on-line chat.  (Id.).  It is

-4-

apparent that most of these individuals believe that Hansen --
who does not identify himself at first -- is a police officer or
the "father" of the decoy.[2]  At some point, Hansen will announce:
"I'm Chris Hansen with Dateline NBC."  (Compl. ¶¶ 14, 16(b), (h);
DVD).

    Upon exiting the house, the men are arrested by the
police.  Several police officers display guns, force the men to
the ground face down, and then handcuff them.  (See Compl. ¶
16(b), (f), (g); DVD).  The men are taken to the police station
where they are processed, photographed, and interviewed by a
police officer, and they are eventually arraigned in court.
(DVD).

    All of these events -- the arrival at the sting house,
the initial entry into the house, the first meeting with the
decoy, the conversation with Hansen, the arrest outside, the
processing and interview at the police station, and the
arraignment in court -- are captured on camera, with video and
sound equipment, including hidden cameras, provided by NBC.
(Compl. ¶¶ 16(b), (g), (j); DVD).  It is apparent that NBC
commits substantial resources to the show.  In the February 20th
episode, for example:  a large house was used; the police were
"staked out" in a U-Haul truck parked on the adjacent property;
there were shots taken from numerous angles, both inside and
outside the house; there is equipment to allow night-time

_____

    [2]    On the February 20th show, one man asks Hansen:  "Am I
under arrest?"  (DVD).

-5-

filming; there is equipment to monitor and record on-line chats and telephone conversations; in one shot, Hansen is standing in front of perhaps eight television monitors; and there are many individuals involved, including Perverted Justice personnel, actors, police officers, and NBC cast and crew.  (DVD).

To increase ratings, Dateline seeks "to sensationalize and enhance the entertainment value" of the confrontations, and accordingly it encourages the police officers "to give a special intensity to any arrests, so as to enhance the camera effect." (Compl. ¶ 16(g), (j).  Indeed, the "mainstay of the show is public humiliation" of the individuals who are lured to the sting houses by the promise of sex with a minor.  (Id. ¶ 14).

In producing "To Catch A Predator," Dateline provides equipment, money, services, and other things of value to local police departments.  (Id. ¶¶ 15, 16(c)).  In return, local law enforcement agrees to participate in the show, permits Dateline to videotape arrests in "dramatically-staged scenarios," provides Dateline with confidential data, and permits Hansen to interview suspects even before detectives interview them.  (Id. ¶¶ 16(b), (d), (h).  Dateline has produced "Predator" segments in, among other places, Riverside County, California; Greenville, Ohio; Fort Myers, Florida; Petaluma, California; Long Beach, California; and Flagler Beach, Florida.  (Id. ¶¶ 52-59).

**3.    The Sting in Murphy, Texas**

In the fall of 2006, Dateline decided to do a segment of "To Catch A Predator" in Murphy, Texas.  (Id. ¶ 18).  City

-6-

officials consented, and Dateline set up a sting house in Murphy.
(Id. ¶¶ 18-19).  Over the course of four days, twenty-four men
were induced to go to the Murphy house, where they were arrested.
(Id. ¶ 20).  As it had done in other cities, Dateline provided
local law enforcement with video equipment and cameras.  (Id. ¶¶
19-20).  Police officers "camped outside" the sting house, and,
when Dateline personnel gave the signal, they arrested the
individuals.  (Id. ¶ 21).

Eventually, however, all of the charges were dropped,
as the local district attorney found that none of the cases could
be prosecuted.  (Id.).

### 4.   Conradt

Conradt lived in the town of Terrell in Kaufman County,
Texas, about an hour's drive from Murphy.  (Id. ¶ 26).  He worked
as an assistant prosecutor in neighboring Rockwell County and had
previously served for five terms as the District Attorney in
Kaufman County.  (Id. ¶ 27).  He resigned that post in 2002 when
he ran, unsuccessfully, for a position as a district judge.
(Id.).  He then practiced as a defense attorney before becoming a
prosecutor in Rockwell County.  (Id.).  He was 56 years old at
the time of his death. (Id. ¶ 26).

In November 2006, during the Murphy operation, Conradt
engaged in on-line communications with a decoy who had been
posing as thirteen-year old boy.  (See id. ¶ 28; Def. Mem. at 2;
DVD).  Conradt did not, however, go to the sting house.  On
Sunday, November 5, 2006, shortly after midnight, Hansen informed

the Murphy police that Conradt had contacted a decoy online and agreed to meet at the house, but he did not appear. (Compl. ¶ 28). Dateline and the police knew that Conradt was an assistant district attorney, and the Murphy police chief described Conradt to NBC as the "chief felony prosecutor" for a neighboring county. (DVD). Hansen asked the police for a "favor," saying, "If he won't come to us, we'll go to him." (Compl. ¶ 28). He insisted that the police obtain search and arrest warrants for Conradt. (Id.).

The Murphy police chief agreed to Hansen's request. (Id. ¶ 29). A detective worked all night preparing first a warrant for Conradt's arrest and then a warrant to search Conradt's home. Both warrants were signed by local judges. (Id. ¶ 31). The judge who signed the search warrant was not informed that Dateline was involved, and he has stated that had he been advised that Deadline was going to be involved, he would not have issued the warrant. (Id. ¶¶ 31-32).

By early Sunday, Hansen and other Dateline personnel were in Terrell. (Id. ¶ 34). Dateline was present, filming, as the police discussed how they were going to execute the warrants. A sergeant who had known Conradt for twenty years was asked whether Conradt had a gun in the house, and the sergeant responded that he did not believe so. (DVD). At times, the police officers spoke directly to the camera. (Id.).

By 3 p.m., Hansen was outside Conradt's house. (Id. ¶ 34). Conradt's house was on a residential street with a large

front yard.  (DVD).  Approximately ten members of the cast and
crew of "To Catch A Predator" -- including cameramen -- were on
the scene.  (Compl. ¶ 36).  Some of Dateline's personnel
trespassed onto Conradt's property.  (Id. ¶¶ 35, 36).  Officers
from both the Murphy and the Terrell police departments were
present, and the Murphy police chief was present as well.  (Id. ¶
35).  At least one representative of Perverted Justice was also
present.  (Id. ¶ 36).  In addition, there were numerous police
vehicles in the street.  (DVD).  From time to time, the police
officers conferred with NBC personnel; near the end of the video,
the Murphy police chief was filmed talking to eight members of a
Dateline crew, two of whom were carrying television cameras and
two others microphones on booms.  (Id.).

        At some point, two officers, one with his gun drawn,
and a detective approached the house.  One officer knocked on
Conradt's front door.  (Id. ¶ 35; see DVD).  There was no
response, but the officers believed Conradt was home.  (Compl. ¶
37).  The Murphy police chief and a lieutenant had been watching
from about thirty feet away, hiding behind trees.  (Id. ¶ 35).
Police officers then huddled with Hansen, in plain view of the
house.  (DVD).  The police chief told Hansen they believed
someone was inside because a television and computer were on.
(Id.).  The police chief then told Hansen that "we're going to
have a little bit of a waiting period" because they were calling
in a "tactical squad."  (See id.; Compl. ¶ 37).  There were
already at least five officers present, and eventually the SWAT

-9-

team arrived, with at least seven more officers, carrying large rifles, some wearing visored helmets. (DVD). In total, more than a dozen police officers were on the scene. (Id.).

Members of the SWAT team opened a locked glass sliding door at the rear of the house and entered. (Compl. ¶ 38).[3] The officers called out "Terrell Police!" and "Search Warrant." (Id. ¶ 40). They saw Conradt standing at the end of a hallway. He stepped into the room and said "I'm not gonna hurt anyone." (Id. ¶ 41). He then shot himself with a handgun. (Id.).

A police officer walked over to Hansen and reported, on camera, that Hansen had shot himself. (DVD). A police officer reportedly said to a Dateline producer:  "That'll make good TV." (Compl. ¶ 42).  Conradt was taken by a helicopter to a hospital in Dallas.  He died within an hour.  (Id.).

NBC was able to obtain photographs of the body, the gun, and death scene, as well as an audiotape of Conradt's last words.  (Id. ¶ 44).  It filmed the house and property and the police operations, including the planning, outside the house.  It filmed the initial effort of the three police officers to access the house as well as the arrival of the SWAT team and its approach to the house.  NBC recorded the sound of the gun shot and filmed emergency medical personnel wheeling Conradt out of the house on a gurney and the helicopter flying him away.  (DVD).

---

[3]    Inside the house, there lay, near Conradt's computer, a workbook from a district attorneys' conference that he had attended a few months earlier.  The workbook was titled: "Investigation and Prosecution of Child Sexual Abuse."  (Compl. ¶ 39).

5.    **The Episode Airs**

On February 20, 2007, NBC aired the episode of "To Catch A Predator" featuring the Murphy sting operation. Approximately the first two-thirds of the episode focused on the visits to the sting house.  The remainder focused on Conradt and the attempt to arrest him at his home.  Much of what appears in the episode is included in the descriptions above.

The episode includes an interview by Hansen of the Murphy police chief in his office after Conradt's death.  The police chief tells Dateline that "we never anticipated anything like this."  He states that "everyone took note of who [Conradt] was."  At one point, he reports that three computers were seized from Conradt's home and had been sent off for forensic examination.  He is asked what could be on the computers, and he responds:  "Unfortunately, and I'm just surmising or guessing here, too, there's going to be something that's way worse than the chats or the pictures he had already sent."  Hence, the police chief was speculating, on camera for national television, as to what might be on the computers that had been seized as evidence from Conradt's house.

The segment closes with footage of Conradt's sister -- the plaintiff in this case -- testifying at a meeting of the Murphy Town Council a few days after the death of her brother. She angrily speaks of the "reckless actions of a self-appointed group acting as judge, jury, and executioner, that was encouraged by an out-of-control reality show."

Hansen concludes by stating that there was no indication that Conradt knew Dateline was involved.

## B.    Prior Proceedings

Plaintiff commenced this action on July 23, 2007, basing subject matter jurisdiction on the existence of a federal question and diversity of citizenship of the parties.  28 U.S.C. §§ 1331, 1332.

Plaintiff filed an amended complaint on September 5, 2007, asserting nine causes of action:  claims on behalf of the Estate under Texas law for intentional infliction of emotional distress, negligence, and unjust enrichment (first, second, and ninth causes of action), under 42 U.S.C. § 1983 for violations of Conradt's civil rights (third cause of action), and for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 et seq. ("RICO") (fourth cause of action); and claims on her own behalf under Texas law for intentional intrusion upon the right to be left alone, intentional disclosure of private facts, intentional infliction of emotional distress, and negligence (fifth, sixth, seventh, and eighth causes of action).

This motion followed.  I heard argument on February 13, 2008.  I dismissed the RICO claim from the bench, ruling that the amended complaint failed to allege that the RICO defendant -- NBC -- and the RICO "enterprise" were separate and distinct, as required for a RICO claim.  See, e.g., Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994)

("by virtue of the distinctiveness requirement, a corporate
entity may not be both the RICO person and the RICO enterprise");
<u>Bennett v. United States Trust Co.</u>, 770 F.2d 308, 315 (2d Cir.
1985).  I reserved decision as to the remaining claims.

<u>**DISCUSSION**</u>

First, I discuss the legal standards applicable to Rule
12(b)(6) motions to dismiss.  Second, I address the claims
asserted by plaintiff on behalf of the Estate.  Third, I address
the claims brought by plaintiff on her own behalf.

**A.    <u>Rule 12(b)(6) Motions</u>**

On a motion to dismiss pursuant to Fed. R. Civ. P.
12(b)(6) for failure to state a claim upon which relief can be
granted, the court must accept the factual allegations of the
non-moving party as true and draw all reasonable inferences in
its favor.  <u>Bernheim v. Litt</u>, 79 F.3d 318, 321 (2d Cir. 1996);
<u>see</u> <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2199 (2007) (per
curiam); <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1965
(2007).  In its recent decision in <u>Bell Atlantic</u>, the Supreme
Court announced the "retirement" of the oft-quoted "no set of
facts" language from <u>Conley v. Gibson</u>, 355 U.S. 41, 45-47 (1957),
adopting in its place a "plausibility" requirement.  <u>Bell Atl.
Corp.</u>, 127 S. Ct. at 1969.  The Court did not establish a
"universal standard of heightened fact pleading, but . . .
instead requir[ed] a flexible 'plausibility standard,' which
obligates a pleader to amplify a claim with some factual
allegations in those contexts where such amplification is needed

-13-

to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).  The question is whether the pleading alleges "'enough facts to state a claim for relief that is plausible on its face.'"  Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007) (quoting Bell Atl. Corp., 127 S. Ct. at 1974).

As the Court acknowledged in Bell Atlantic, Rule 8(a) still requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and thus a pleading is not required to set forth "detailed factual allegations."  127 S. Ct. at 1964-65. Moreover, a pleading need not set forth all the facts a pleader intends to prove, for the inquiry remains "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"  Id. at 1969 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  Hence, the question is whether the plaintiff has stated "enough facts" to "nudge[] [its] claims across the line from conceivable to plausible."  Bell Atlantic, 127 S. Ct. at 1974.

In deciding a motion to dismiss, a court may consider the challenged pleading, any documents incorporated by reference, and matters subject to judicial notice.  See Prentice v. Apfel, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) (citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)).  "'[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations'" and will not defeat the motion.  Gavish v. Revlon, Inc., No. 00 Civ. 7291 (SHS), 2004 WL

-14-

2210269, at *10 (S.D.N.Y. Sept. 30, 2004) (quoting <u>Citibank, N.A.</u>

<u>v. Itochu Int'l, Inc.</u>, No. 01 Civ. 6007 (GBD), 2003 WL 1797847,

at *1 (S.D.N.Y. Apr. 4, 2003)).

**B.    <u>The Estate's Claims</u>**

      With the RICO claim dismissed, four claims remain on

behalf of the Estate:  (1) violation of Conradt's civil rights,

(2) intentional infliction of emotional distress, (3) negligence,

and (4) unjust enrichment.  I discuss each claim in turn.

      **1.    <u>The Civil Rights Claim</u>**

      **a.    <u>Section 1983</u>**

      Section 1983 imposes civil liability upon a party:

> who, under color of law of any statute,
> ordinance, regulation, custom, or usage, of
> any State . . . subjects or causes to be
> subjected, any citizen of the United States
> or other person within the jurisdiction
> thereof to the deprivation of any rights,
> privileges, or immunities secured by the
> Constitution and law.

42 U.S.C. § 1983; <u>see</u> <u>Williams v. N.Y. City Hous. Auth.</u>, No. 05

Civ. 2750 (DC), 2007 WL 4215876, at *4 (S.D.N.Y. Nov. 30, 2007).

      To prevail on a § 1983 claim, a plaintiff must show

that (1) the defendant acted under color of state law and (2) the

defendant's actions deprived plaintiff of her constitutional

rights or privileges.  <u>Knight v. City of New York</u>, 303 F. Supp.

2d 485, 501 (S.D.N.Y. 2000) (citing <u>Eagleston v. Guido</u>, 41 F.3d

865, 872 (2d Cir. 1994)).

      As to the first element, although NBC is not a "state

actor," the amended complaint alleges that the actions of the

-15-

police officer must be imputed to NBC. (Compl. ¶¶ 10, 11). NBC does not dispute this allegation for purposes of this motion. (See Def. Mem. at 7 & n.3). Accordingly, for purposes of this motion only, I assume the first element is met.[4]

As to the second element, plaintiff alleges that Conradt's constitutional rights were violated in two respects: (1) he was subjected to an unreasonable search and seizure, in violation of the Fourth Amendment (Compl. ¶ 64), and (2) he was deprived of life, liberty, and property without due process of law, in violation of the Fourteenth Amendment (id. ¶¶ 65, 76).

### b.    Application

I discuss the Fourth Amendment claim first and the Fourteenth Amendment claim second.

### (i)   The Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The Supreme Court has held that:

---

[4]      See Berger v. Hanlon, 129 F.3d 505, 514 (9th Cir. 1997) (holding that media defendants were governmental actors for purpose of Bivens action because they collaborated with government officials in execution of search warrant), vacated and remanded on other grounds, 526 U.S. 808 (1999), on remand 188 F.3d 1155 (9th Cir. 1999); Dwares v. City of N.Y., 985 F.2d 94, 98 (2d Cir. 1983) ("A private individual may be subject to liability under [§ 1983] if he or she willfully collaborated with an official state actor in the deprivation of the federal right.").

> The touchstone of the Fourth Amendment
> is reasonableness, and the reasonableness of
> the search is determined by 'assessing, on
> the one hand, the degree to which it intrudes
> upon an individual's privacy and, on the
> other, the degree to which it is needed for
> the promotion of legitimate governmental
> interests.

United States v. Knights, 534 U.S. 112, 118-19 (2001) (quoting

Wyoming v. Houghton, 526 U.S. 295, 300 (1999)); accord United

States v. Chirino, 483 F.3d 141, 147 (2d Cir. 2007).

At this early stage of the litigation, I conclude that

a fair issue exists as to the reasonableness of the police

officers' (and NBC's) actions in this case.  Based on the

allegations of the amended complaint, I conclude that a

reasonable jury could find that the intrusion on Conradt's

privacy substantially outweighed the promotion of legitimate

governmental interests.

If the facts alleged in the amended complaint are true,

the intrusion was great -- Dateline was camped outside Conradt's

house with cameras and crew, waiting to film his arrest for a

national television show, as a SWAT team entered his home.  On

the other hand, the extent to which the search was necessary to

promote a legitimate governmental interest is debatable.

Although there are legitimate reasons for publicizing arrests,

see Caldarola v. County of Westchester, 343 F.3d 570, 576 (2d

Cir. 2003), the amended complaint plausibly asserts that many of

the police officers' actions were motivated not by a genuine law

enforcement need, but by Dateline's desire for more sensational

footage.  (See Compl. ¶ 72 (NBC "did push law enforcement

-17-

agencies to do what they otherwise would not do.")).  For example, on the circumstances presented, a reasonable jury could find that the following decisions and actions of the police officers were motivated at least in part by Dateline's involvement:

- the decision to pursue Conradt at all, given that he never went to the sting house (notably, even the 24 men who did show up were not prosecuted in the end);

- the decision to arrest Conradt at his home rather than letting him surrender to the police or arresting him in a more controlled environment, such as his office or even a courthouse;

- the discussion of strategy and execution of the warrants in the presence of the media, on camera;

- caucusing with Dateline personnel in the midst of a police operation in plain view of Conradt's house;

- the use of more than a dozen officers to arrest a long-time prosecutor not suspected of being violent or having a gun;

- the use of a SWAT team; and

- reporting significant developments to Dateline, on camera, as they were happening.

Certain other actions also would appear to be deviations from prudent law enforcement practice.  In the operations at the sting

-18-

house, for example, the police permitted Dateline to interview the suspects first, before the police interviewed them. And in his interview with Dateline after Conradt's suicide, the Murphy police chief was willing to speculate on camera as to what a forensic examination of Conradt's computers might show.

The Supreme Court has recognized that the Fourth Amendment is violated if the media overly intrudes into a law enforcement operation. In Wilson v. Layne, 526 U.S. 603 (1999), a "media ride-along" case, a Washington Post reporter and photographer accompanied law enforcement agents as they attempted to execute arrest warrants in a home. Id. at 606, 614. The Supreme Court held that the Fourth Amendment was violated because police brought the media into a home during the execution of a warrant, when the media's presence was not in aid of the execution of the warrants. Id. at 614.

Similarly, in Hanlon v. Berger, the Ninth Circuit held that the Fourth Amendment was violated when CNN camera crews accompanied federal agents as they executed a search warrant on a 75,000-acre ranch in Montana in connection with an investigation of an individual believed to be poisoning eagles. 129 F.3d at 510-12. CNN had entered into a written contract with the U.S. Attorney's Office to allow CNN camera crews to accompany law enforcement agents as they executed the warrant. CNN was involved in planning the search, and CNN crew members and cameras "invaded the residential property of the plaintiffs." Id. at 508, 510. Although CNN did not enter the home, it provided one

-19-

of the agents with a microphone, and that agent entered the home
and recorded conversations with the plaintiffs.  Id. at 509-10.
Because the media was present for "a major purpose other than law
enforcement," that is, to obtain "material for . . . commercial
programming," the court held that the intrusion was unreasonable
and that the search violated the Fourth Amendment.  Id. at 510-
11.  The court contrasted the case with cases where media played
"a passive role, as observers, rather than as active participants
in planned activity that transformed the execution of a search
warrant into television entertainment."  Id. at 512.

        On appeal, the Supreme Court agreed that these facts
stated a Fourth Amendment violation.  Hanlon v. Berger, 526 U.S.
808, 809-10 (1999).  The Court vacated and remanded, however,
because it concluded that the law enforcement defendants were
protected by the doctrine of qualified immunity, as the law was
not clearly established when the events in question occurred.
Id. at 810.  On remand, the Ninth Circuit dismissed the claims as
to the law enforcement officers based on qualified immunity, but
held that the plaintiffs could proceed with their Fourth
Amendment (and state law) claims against the media defendants.
Berger v. Hanlon, 188 F.3d at 1155.

        Here, although the amended complaint does not allege
that Dateline representatives entered the house, it does
plausibly allege, in substance, that Dateline personnel were
"active participants in planned activity that transformed the
execution of [the warrants] into television entertainment."

-20-

Berger v. Hanlon, 129 F.3d at 512.  The amended complaint alleges
that the Dateline representatives did not just have a "passive
role, as observers," but that they were involved in the planning,
and that, indeed, they purportedly pushed the police officers
into dramatizing their actions for the benefit of the television
cameras.  Moreover, the amended complaint alleges that Dateline
personnel trespassed onto Conradt's property.

NBC steadfastly denies these allegations, but for
purposes of this motion to dismiss, of course, I must assume the
allegations are true.

NBC argues that, even assuming the allegations of the
amended complaint are true, Conradt's Fourth Amendment claim is
barred as a matter of law because the police officers had arrest
and search warrants that authorized them to enter the house,
which thus insulated them from liability.  (See Def. Mem. at 10-
11).  The argument is rejected, for in the circumstances alleged
here, the issuance of the warrants does not insulate the officers
and NBC from liability.  The warrants may very well be void
because the judges were not fully apprised (if at all) of
Dateline's involvement.  See Wilson v. Layne, 526 U.S. at 606
(noting that warrants made no mention of media presence or
involvement in execution of warrants); Berger v. Hanlon, 129 F.3d
at 510-12 (noting that law enforcement obtained warrant without
disclosing media's involvement); Ayeni v. Mottola, 35 F.3d 680,
685 (2d Cir. 1994) (noting search warrant affidavit did not
request, and warrant did not permit, television camera crew or

-21-

video or sound recording), abrogated on other grounds, Wilson v.
Layne, 526 U.S. at 617-18.  Moreover, the amended complaint
alleges, in substance, that the warrants should not have been
issued in the first place, and that they were issued primarily
for dramatic effect, for the sake of a more exciting television
show.

Finally, NBC relies heavily in this respect on
Caldarola v. County of Westchester, 343 F.3d 570 (2d Cir. 2003),
a "perp walk case."  There, several Westchester County
corrections officers were arrested for fraud in connection with
disability benefits.  The Department of Corrections ("DOC")
videotaped the officers as they were being escorted from the DOC
building where they were arrested to the cars in which they were
to be transported to the police station for booking.  DOC
released copies of the videotape to the media.  In addition, DOC
alerted the media when the arrestees arrived at the courthouse
for arraignment, and the media filmed them as well.  Id. at 572.

The Second Circuit held that the arrestees' Fourth
Amendment rights were not violated because their privacy
interests were outweighed by the County's legitimate law
enforcement interests in publicizing the arrest of public
employees for grand larceny -- enhancing the transparency of the
criminal justice system and deterring others from committing
similar crimes.  Id. at 576.

Although these interests are important in the instant
case as well, Caldarola does not support dismissal here.  In

-22-

Caldarola, the media merely served in its traditional role as observer; it was the County that chose to make the videotape, and the County released the videotape to the media after the corrections officers had already been arrested.  Here, Dateline allegedly had a much more active role, as it was purportedly involved in planning the execution of the warrants, and Dateline was involved even before any effort was made to arrest Conradt.

In addition, the court in Caldarola took pains to distinguish another "perp walk" case, Lauro v. Charles, 219 F.3d 202 (2d Cir. 2000), where the Second Circuit held that a "staged" perp walk -- the defendant was taken out of the police station two hours after his arrest, driven around the block, and then made to re-enter the police station just so that a televison crew could film him -- violated his rights.  The Caldarola court noted that the Lauro court held that the staged perp walk was "an inherently fictional dramatization" that served no legitimate governmental interest.  Caldarola, 343 F.3d at 573, 575-76 (quoting Lauro, 219 F.3d at 213).  Here, the amended complaint plausibly alleges, in substance, that some aspects of the execution of the warrants were "inherently fictional dramatization[s]" that served no legitimate law enforcement purpose.  See also Ayeni, 35 F.3d at 686 ("A private home is not a soundstage for law enforcement theatricals.").

NBC's motion is denied to the extent it seeks dismissal of the Fourth Amendment claim.

## (ii) **The Fourteenth Amendment**

To sustain a § 1983 claim based on a Fourteenth Amendment due process violation, a plaintiff must show that (1) she possessed a liberty or property interest protected by law and (2) she was deprived of that interest without due process. Ciambriello v. County of Nassau, 292 F.3d 307, 313 (2d Cir. 2002); Williams v. N.Y. City Hous. Auth., 2007 WL 4215876, at *6.

In moving to dismiss this claim, NBC argues principally that under Texas law a party has no duty to prevent the suicide of another and that generally suicide is an intervening cause that breaks the chain of causation in a civil action for personal injury or wrongful death. Exxon Corp. v. Brecheen, 526 S.W.2d 519, 523 (Tex. 1975); Shell Oil Co. v. Humphrey, 880 S.W.2d 170, 174 (Tex. App. 1994); see also DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197 (1989) ("a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause"). Moreover, while acknowledging the "special relationship" cases where courts have imposed a duty on the state to protect individuals in their custody (for example, prisoners and involuntarily committed mental patients) from committing suicide, NBC argues that in those cases the state officials "'knew of a substantial risk that the detainee might commit suicide and violated the detainee's rights by responding with deliberate indifference.'" (Def. Mem. at 8 (quoting Hanrahan v. City of Norwich, 959 F. Supp. 118, 122 n.6 (D. Conn. 1997), aff'd, 133 F.3d 907 (2d Cir. 1997)). See

-24-

also Mroz v. City of Tonawanda, 999 F. Supp. 436, 456 (W.D.N.Y. 1998).  NBC contends that here there is no allegation that anyone knew that Conradt posed a risk of suicide, as the amended complaint does not allege that Conradt threatened to commit suicide or exhibited any sign of a suicidal tendency.  (Def. Mem. at 9-10).

NBC's arguments are rejected.  As an initial matter, the Estate is suing not just for the suicide, but for other injuries as well, including, for example, the invasion of Conradt's privacy, the intrusion into his home, and the public ridicule and loss of his good name.  (Compl. ¶¶ 46, 47, 68, 73, 76).  The claims for damages for these injuries are independent of the suicide (at least to some extent) and would survive even assuming the suicide were deemed an intervening cause in the chain of causation.  Similarly, the manner in which the police arrested Conradt -- with the involvement of a dozen or so armed police officers -- surely presented risks other than suicide, including the risk that Conradt or someone else would be shot or otherwise injured.

More importantly, with respect to the suicide, I conclude that the amended complaint alleges sufficient facts to render plausible plaintiff's claims that (1) the suicide was foreseeable, (2) the police officers had a duty to take steps to protect Conradt from taking his own life, and (3) the police officers and NBC acted with deliberate indifference and in a manner that would shock one's conscience.

First, the amended complaint expressly alleges that "[t]he suicide was reasonably foreseeable." (Compl. ¶ 62).  The assertion is plausible, in light of the circumstances described in the amended complaint and the facts that can be inferred from those circumstances:  Conradt was an upstanding citizen, a leader in his community, an assistant district attorney, and a former District Attorney.  (Id. ¶¶ 27, 46).  He was 56 years old and had practiced law for 30 years.  (Id. ¶ 46).  "[F]rom the earliest days, [he] had chosen a good name rather than great riches." (Id. ¶ 47).  That afternoon, at home, he likely looked out the window and saw police officers and police vehicles, reporters and news trucks, camera men and television cameras -- all waiting for his arrest.  (Id. ¶¶ 34-38, 44).  He likely saw that the media had "trespassed and invaded upon [his] property to broadcast a spectacle to millions."  (Id. ¶ 63).  He likely also saw the police officers, including the Murphy police chief, conferring with members of the media.  (DVD).  He likely saw a SWAT team, brandishing guns, about to invade his home.  (Compl. ¶¶ 37, 38).

Under these circumstances, it is entirely plausible that Conradt, as he was about to be arrested for soliciting sex with a minor, envisioned being brought out of the house, hands handcuffed behind his back, escorted by armed police officers, with television cameras rolling, and his career and life in ruins.  Under these circumstances, a reasonable jury could find that his "emotional state might be frail" and that the risk of suicide was substantial.  (Id. ¶ 62).

-26-

Second, plaintiff's contention that the officers (and NBC) had a duty to take steps to prevent Conradt from committing suicide is certainly plausible.  There very well may have been, under the circumstances, a "special relationship" between Conradt and the police; "[w]hen in the custody of police, an arrestee has the right to care and protection, including protection from suicide."  <u>Kelsey v. City of New York</u>, No. 03 Civ. 5978 (JFB), 2006 WL 3725543, at *4 (E.D.N.Y. Dec. 18, 2006) (footnote omitted); <u>see also</u> <u>Hare v. Corinth, Miss.</u>, 74 F.3d 633, 647, 648 & n.3 (5th Cir. 1996) (collecting cases involving claims for failure to protect individuals in custody from suicide).  The courts have also recognized a "state-created danger" exception, holding that "liability may attach where the state acts to <u>create</u> or <u>enhance</u> a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process." <u>Sanford v. Stiles</u>, 456 F.3d 298, 304 (3d Cir. 2006) (emphasis in original) (affirming grant of summary judgment dismissing claims brought on behalf of student who committed suicide, where no reasonable jury could find that guidance counselor acted in manner that "shocks the conscience" or that she created opportunity for harm that otherwise would not have existed).[5]

---

[5]    <u>Accord</u> <u>Martin v. Shawano-Gresham Sch. Dist.</u>, 295 F.3d 701, 708 (7th Cir. 2002) (under "state-created danger" exception, plaintiffs "state claims for civil rights violations if they allege state action that created, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to danger [than] they otherwise would have been") (quoting <u>Reed v. Gardner</u>, 986 F.2d 1122, 1126 (7th Cir. 1993)); <u>Armijo v. Wagon Mound Pub. Schs.</u>, 159 F.3d 1253, 1264 (10th Cir. 1998) (holding that district court properly denied summary judgment in suicide

In the instant case, the facts alleged in the complaint
are sufficient to justify permitting plaintiff to proceed with
the assertions that Conradt had a "special relationship" with the
police and that the police (and NBC) created or increased the
risk of suicide or other harm.

Third, the amended complaint also asserts a plausible
claim that the police and NBC acted with deliberate indifference
to Conradt's rights and the risk of suicide, and that they acted
in a manner and with a state of culpability that would shock
one's conscience.  As discussed above, based on the allegations
in the amended complaint, a reasonable jury could find that NBC
persuaded the police officers to engage in tactics principally
for dramatic effect and to make a more sensational television
show, in a manner that they knew would publicly humiliate a
public servant who had always been an upstanding member of the
community, thereby creating or enhancing the risk of suicide or
other danger, without taking any steps to prevent a foreseeable
injury.  See Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.
1996) ("[D]eliberate indifference involves unnecessary and wanton
infliction of pain, or other conduct that shocks the

---

case involving student, where issues of fact existed as to
whether school counselor and principal created or increased risk
of suicide and acted in reckless and conscious disregard of risk
of suicide when they suspended special education student who had
previously displayed suicidal tendencies and then took him home
where he was alone with firearms); Dwares v. City of New York,
985 F.2d 94, 99 (2d Cir. 1993) (due process rights are implicated
where "officers in some way had assisted in creating or
increasing the danger [of violence] to the victim [from private
actors]").

conscience."); <u>Kelsey</u>, 2006 WL at 3725543, at *5 ("'Deliberate
indifference' describes a mental state more blameworthy than
negligence; but a plaintiff is not required to show that the
defendant acted for 'the very purpose of causing harm or with
knowledge that harm will result.'") (quoting <u>Hernandez v. Keane</u>,
341 F.3d 137, 144 (2d Cir. 2003) (quoting <u>Farmer v. Brennan</u>, 511
U.S. 825, 835 (1994))).

        This prong of NBC's motion to dismiss is denied.

### 2.    Intentional Infliction of Emotional Distress

####     a.    Applicable Law

        Under Texas law, to recover damages for intentional
infliction of emotional distress, a plaintiff must prove that:

> (1) the defendant acted intentionally or
> recklessly; (2) the defendant's conduct was
> extreme and outrageous; (3) the defendant's
> actions caused the plaintiff emotional
> distress; and (4) the resulting emotional
> distress was severe.

<u>Hoffmann-La Roche Inc. v. Zeltwanger</u>, 144 S.W.3d 438, 445 (Tex.
2004).

        Texas follows the Restatement (Second) of Torts in
defining "extreme and outrageous conduct" as conduct "'so
outrageous in character, and so extreme in degree, as to go
beyond all possible bounds of decency, and to be regarded as
atrocious, and utterly intolerable in a civilized community.'"
<u>Twyman v. Twyman</u>, 855 S.W.2d 619, 621 (Tex. 1993) (quoting
Restatement (Second) of Torts § 46 cmt. d (1965) (hereafter
"Restatement")).   The tort does not encompass "mere insults,

-29-

indignities, threats, annoyances, petty oppressions, or other trivialities." <u>Hoffmann-La Roche</u>, 144 S.W.3d at 445.  Although difficult to define, outrageousness is determined as a practical matter by community standards.  <u>See</u> Restatement § 46(1) cmt. d (instructing that, to be actionable, defendant's conduct must be deemed "utterly intolerable in a civilized community" and must "arouse resentment" by an "average member of the community").  In the first instance, the court determines whether conduct is extreme and outrageous, but if reasonable minds can differ, then the issue is for the jury to decide.  <u>Hoffmann-La Roche</u>, 144 S.W.3d at 445.

The Restatement provides some guidelines.  Comment e suggests that "extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests."  Restatement § 46(1) cmt. e.[6]  Examples illustrating this comment include a private detective who represents himself as a police officer and threatens arrest, <u>id.</u>, illus. 5, and a school principal who

_____

[6]    <u>See</u> Daniel Givelber, <u>The Right to Minimum Social Decency and the Limits of Evenhandedness:  Intentional Infliction of Emotional Distress by Outrageous Conduct</u>, 82 Colum. L. Rev. 42, 68 (1982) (tort is "less concerned with whether people get the benefit of the bargain (the province of contract law) and more concerned with how the dominant party treats the other during their legal life together"); John J. Kircher, <u>The Four Faces of Tort Law:  Liability for Emotional Harm</u>, 90 Marq. L. Rev. 789, 803 (2007) ("In general, four categories of conduct support a finding of outrage when the defendant intentionally inflicts emotional harm:  [the first is] abusing a position of power.").

accuses a student of immoral conduct and threatens public
disgrace, id., illus. 6.

The Restatement also suggests that outrageousness "may
arise from the actor's knowledge that the other is peculiarly
susceptible to emotional distress, by reason of some physical or
mental condition or peculiarity.  The conduct may become
heartless, flagrant, and outrageous when the actor proceeds in
the face of such knowledge, where it would not be so if he did
not know."  Restatement § 46(1) cmt. f.  The Restatement gives as
an illustration of this comment the example where A, knowing B is
pregnant, shoots a dog in B's presence, knowing B is greatly
attached to the dog, causing B severe emotional distress, which
results in a miscarriage; A is liable for B's emotional distress
and miscarriage.  Id., illus. 11.

### b.  **Application**

In moving to dismiss the Estate's claim for intentional
infliction of emotional distress, NBC makes two principal
arguments.  First, it notes that "'a plaintiff may not assert a
claim for intentional infliction of emotional distress merely
because of his inability to prevail on another theory of relief
designed to address the gravamen of his complaint,'" and argues
that plaintiff here is seeking to do just that.  (Def. Mem. at 12
(quoting Almond v. Tarver, 468 F. Supp. 2d 886, 904-05 (E.D. Tex.
2006)).  Second, NBC argues that the alleged conduct was not
sufficiently "outrageous and extreme" to meet the requirements of
the tort.  (Def. Mem. at 16-17).  Both arguments are rejected.

First, while intentional infliction of emotional distress is "a 'gap-filler' tort never intended to supplant or duplicate existing statutory or common-law remedies," Creditwatch, Inc. v. Jackson, 157 S.W.3d 814, 816 (Tex. 2005), it is premature to dismiss the claim on these grounds at this time. The tort was created "for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." Hoffman-La Roche, 144 S.W.3d at 447.

On the facts alleged in the amended complaint, plaintiff's contention that this is one of "those rare instances" is plausible. Plaintiff may very well be able to show that there is an independent basis for a claim of intentional infliction of emotional distress. Moreover, I do not believe plaintiff is asserting this claim as a means to circumvent impediments to other claims, and, in fact, I have held that she may proceed with her claims under § 1983. Finally, of course, plaintiff is permitted to plead "in the alternative," under Rule 8(a) of the Federal Rules of Civil Procedure, and she is doing so here. If NBC so desires, I will revisit this issue at the summary judgment stage, when I will be in a better position to decide whether "the gravamen of . . . plaintiff's complaint is really another tort" or claim. Id.

Second, I conclude that reasonable minds could differ as to whether NBC's conduct was so "outrageous and extreme" as to

exceed all possible bounds of decency.  NBC argues that the
amended complaint merely alleges that it:

> conducted a news investigation into a subject
> of manifest public concern -- sexual
> predators targeting minors via the Internet.
> In connection with that investigation, NBC
> purportedly informed law enforcement of Mr.
> Conradt's suspected criminal activity, urged
> them to obtain warrants and were outside Mr.
> Conradt's house when they attempted to arrest
> him.  Such conduct cannot be held to be
> extreme and outrageous as a matter of Texas
> law.

(Def. Mem. at 17).

The amended complaint, however, alleges far more -- it
alleges that NBC intruded into a law enforcement operation to
such an extent that the police officers deviated from sound
police practice, solely for the sake of creating a more dramatic
television show.  It alleges that what happened here was neither
news nor law enforcement, but a blurring of the two with a tragic
consequence -- to avoid public humiliation, an otherwise law-
abiding man was shamed into committing suicide, before he had
been charged by any court, before he had any opportunity to be
heard.  Significantly, two of the circumstances that give rise to
a finding of outrageousness are arguably present here:  NBC was
in a position of power, both with its ability to disseminate
information to the public and with its apparent influence over
the police, and NBC knew or should have known that Conradt was
peculiarly susceptible to emotional distress and suicide.

In considering whether NBC's conduct was outrageous, a
jury could take note of the fact that, as alleged in the amended

complaint, NBC failed to act "ethically" and violated "numerous journalistic standards." (Compl. ¶ 16). The reporter-subject relationship is not monitored by statute, but the profession is guided by self-enforced principles and standards of practice.[7] Although unethical conduct, by itself, does not necessarily equate to outrageous conduct, the failure to abide by these journalistic standards may indeed be relevant to the jury's determination of whether Dateline acted in a reckless and outrageous manner.

The allegations of the amended complaint implicate numerous ethical principles. For instance, SPJ's code of ethics states that journalists should:

- "Avoid . . . staged news events."

- "Distinguish between advocacy and news reporting."

- "Recognize that gathering and reporting information may cause harm or discomfort."

- "Recognize that private people have a greater right to control information about themselves than do public officials and others who seek power, influence or attention. Only an overriding public need can justify intrusion into anyone's privacy."

---

[7] Certain national journalism organizations, including the Society of Professional Journalists (the "SPJ") and the Radio-Television News Directors Association (the "RTNDA"), have formulated codes of ethics or "canons of journalism." The SPJ states that it is "the nation's most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior." (See http://www.spj.org/aboutspj.asp (last visited Feb. 22, 2008)). The RTNDA describes itself as "the world's largest professional organization exclusively serving the electronic news profession," which includes "electronic journalists in radio, television and all digital media, as well as journalism educators and students." (See http://www.rtnda.org/pages/about-rtnda.php (last visited Feb. 22, 2008)).

- "Show good taste.  Avoid pandering to lurid curiosity."

- "Be judicious about naming criminal suspects before the formal filing of charges."[8]

- "Avoid conflicts of interest, real or perceived."

- "Be wary of sources offering information for favors or money; avoid bidding for news."

(SPJ Code of Ethics, http://www.spj.org/ethicscode.asp (last visited Feb. 22, 2008).[9]

In the circumstances alleged in the amended complaint, a reasonable jury could find that Dateline violated some or all of these standards by failing to take steps to minimize the potential harm to Conradt, by pandering to lurid curiosity, by staging (or overly dramatizing) certain events, by paying Perverted Justice and providing equipment and other consideration

---

[8]    In its "Guidelines for Covering Law Enforcement," the RTNDA instructs journalists to "[f]ight the urge to become a player in any standoff."  (See RTNDA, Code of Ethics and Professional Conduct, http://www.rtnda.org/pages/media_items/code-of-ethics-and-professional-conduct48.php?g=36?id=48 (last visited Feb. 22, 2008)).

[9]    Commentators on journalistic ethics have raised concerns about the ethics of "To Catch A Predator." See, e.g., Gary Hill, Putting "Predator" Under the Microscope, SPJ Ethics Answers, http://www.spj.org/ethicsdearspj1.asp (last visited Feb. 22, 2008) ("Dateline finds itself in a financial arrangement with people [Perverted Justice] who are working directly with law enforcement for the apprehension and prosecution of individuals who are caught in a sting that is orchestrated by Dateline, PJ.com and local authorities.  As these individuals go to trial, I don't see how Dateline can be anything other than an active part of the prosecution."); Douglas McCollam, The Shame Game, Colum. Journalism Rev., Jan.-Feb. 2007, available at http://www.cjr.org/ feature/the_ shame_game.php (last visited Feb. 23, 2008) ("Dateline hasn't so much covered a story as created one.  In the process it has further compromised the barrier between reporters and cops that is central to the mission of journalism.").

-35-

to law enforcement, by failing to be judicious about publicizing allegations before the filing of charges, by advocating a cause rather than independently examining a problem, and by manufacturing the news rather than merely reporting it. In light of the consequences here, an "average member of the community" could find that NBC abused its power -- the power of the press enhanced by the involvement of law enforcement -- in reckless disregard of Conradt's rights, in a manner that overstepped "all possible bounds of decency." Twyman v. Twyman, 855 S.W.2d at 621.

NBC's motion is denied to the extent it seeks dismissal of the claim for intentional infliction of emotional distress.[10]

### 3. **Negligence**

In her second cause of action, plaintiff sues on behalf of the Estate for negligence, arguing that NBC owed Conradt a two-fold duty "(a) not to push law enforcement agencies to do what they otherwise would not do and (b) to protect against such risks as suicide in case the defendant would push." (Compl. ¶ 71).

The negligence claim fails. Although I have held above that plaintiff is entitled to some latitude in pleading at this

---

[10]     It should be noted that "To Catch A Predator" has also been the subject of praise. Some have argued, for example, that the show has "increased public awareness of Internet dangers by trading the use of guns to pursue criminals for televised, large-scale Internet sting operations to track down sex offenders." Bridget M. Boggess, Attempted Enticement of a Minor: No Place for Pedophiles to Hide Under 18 U.S.C. § 2422(B), 72 Mo. L. Rev. 909, 909 (2007).

juncture, her claims clearly sound in intentional or reckless --
and not negligent -- conduct.  Whether her claims are more
properly characterized as civil rights claims or intentional
infliction of emotional distress, they do not properly sound in
negligence.  See, e.g., Smith v. Sneed, 938 S.W.2d 181, 185 (Tex.
App. 1997) (negligence claim dismissed where plaintiff was
seeking, in substance, to "convert the tort of malicious
prosecution to one of negligent prosecution"); Campbell v. City
of San Antonio, 43 F.3d 973, 980 (5th Cir. 1995) (dismissing
negligence claim under Texas law because "torts which are most
analogous to [plaintiff's] situation . . . [are] libel and
slander[] and malicious prosecution").  For plaintiff to prevail
in this action, she will have to prove reckless or intentional
conduct.

        NBC's motion is granted to the extent that plaintiff's
second cause of action is dismissed.

        **4.    Unjust Enrichment**

        Plaintiff's ninth cause of action asserts an unjust
enrichment claim against the Estate.  The claim is dismissed, for
under Texas law, unjust enrichment is not "an independent cause
of action, but rather 'belongs to the measure of damages known as
quasi-contract or restitution.'"  Best Buy Co. v. Barrera, 214
S.W.3d 66, 73 (Tex. App. 2006) (citation omitted), rev'd on other
grounds, 2007 WL 4216615 (Tex. 2007).  The doctrine of unjust
enrichment usually applies to a situation where there is a
relationship between two parties that is not covered by an

-37-

express contract, or where there is an express contract but it is unenforceable.  In other words, the plaintiff has provided a benefit that the defendant, in equity and good conscience, ought not to retain.  See id. at 67; First Union Nat'l Bank v. Richmont Capital Partners I, L.P., 168 S.W.3d 917, 931 (Tex. App. 2005) ("[u]njust enrichment claims are based on quasi-contract and are predicated on the absence of an express contract").

Here, there is no allegation of an implied or quasi-contract between Conradt and NBC, nor could there be.  This prong of the motion is granted.

## C.    Plaintiff's Individual Claims

Plaintiff asserts four claims on her own behalf: intentional intrusion on the right to be left alone (fifth cause of action), intentional disclosure of private facts (sixth cause of action), intentional infliction of emotional distress (seventh cause of action), and negligence (eighth cause of action).

The fifth and sixth causes of action are dismissed because plaintiff lacks standing to assert these claims in her own name.  Under Texas law, claims for injury to reputation and invasion of the right to privacy may only be brought by or on behalf of the individuals who are actually the subject of the wrongful acts.  See, e.g., Ritzmann v. Weekly World News, Inc., 614 F. Supp. 1336, 1339 (N.D. Tex. 1985) ("unless the plaintiff herself is the particular person with references to whom defamatory statements were made, she has no cause of action"); Moore v. Charles B. Pierce Film Enters., Inc., 589 S.W.2d 489,

491 (Tex. App. 1979) (privacy is personal right and action for invasion of privacy "terminates upon the death of the person whose privacy is invaded"); <u>Gonzales v. Times Herald Printing Co.</u>, 513 S.W.2d 124, 126 (Tex. App. 1974) ("a libel upon the memory of a deceased person . . . does not give [his relatives] any right of action, although they may have thereby suffered mental anguish or sustained an impairment of their social standing"); <u>Renfro Drug v. Lawson</u>, 160 S.W.2d 246, 249 (Tex. App. 1942) ("[T]he law does not contemplate . . . defamation of the dead[] as causing any special damage to another individual, though related to the deceased, and therefore it cannot be made the basis of recovery in a civil action."). Under Texas law, where the invasion was directed primarily at the deceased, a relative of the deceased has no claim for invasion of privacy. <u>Justice v. Belo Broad. Corp.</u>, 472 F. Supp. 145, 147 (N.D. Tex. 1979).

The seventh cause of action is dismissed, for Texas law does not permit a plaintiff to sue for intentional infliction of emotional distress unless the defendant's conduct is "about or directed at" the plaintiff. <u>Doe v. Mobile Video Tapes, Inc.</u>, 43 S.W.3d 40, 49 (Tex. App. 2001); <u>see also</u> <u>Mineer v. Williams</u>, 82 F. Supp. 2d 702, 707 (E.D. Ky. 2000) (statements made in broadcast about plaintiff's son did not give rise to claim for intentional infliction of emotional distress for her).

The eighth cause of action is dismissed for the reasons set forth above with respect to the Estate's negligence claim.

## CONCLUSION

For the reasons set forth above, NBC's motion to dismiss is granted in part and denied in part. All of plaintiff's individual claims (the fifth, sixth, seventh, and eighth causes of action) are dismissed. The Estate's negligence, RICO, and unjust enrichment claims (the second, fourth, and ninth causes of action) are dismissed as well. The motion is denied, however, as to the Estate's intentional infliction of emotional distress and civil rights claims (first and third causes of action). Counsel shall appear for a pretrial conference on March 14, 2008, at 3:00 p.m.

SO ORDERED.

Dated:     New York, New York
           February 26, 2008

DENNY CHIN
United States District Judge

-40-